# EXHIBIT G

Gregory L. Diskant
Michael F. Buchanan
Brian N. Lasky
Edward R. Tempesta
Sean Marshall
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000
Facsimile 212-336-2222

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: METHOD OF PROCESSING ETHANOL BYPRODUCTS AND RELATED SUBSYSTEMS ('858) PATENT LITIGATION | 1:10-ml-02181-LJM-DML |
| THIS DOCUMENT RELATES TO: | Hon. Larry J. McKinney, U.S.D.J.<br>Hon. Debra McVicker Lynch, U.S.M.J. |
| 1:10-CV-8006-LJM-DML | **JURY TRIAL DEMANDED** |

### GEA WESTFALIA SEPARATOR, INC. AND ACE ETHANOL, LLC'S
### THIRD AMENDED COMPLAINT AGAINST
### GREENSHIFT CORPORATION AND GS CLEANTECH CORPORATION

Plaintiffs GEA Westfalia Separator, Inc. ("Westfalia") and Ace Ethanol, LLC ("Ace Ethanol"), by their attorneys Patterson Belknap Webb & Tyler LLP, for their complaint against defendants GreenShift Corporation ("GreenShift") and GS CleanTech Corporation ("GS CleanTech") (collectively, "Defendants"), allege as follows:

## NATURE OF ACTION

1.       In this action, Plaintiffs Westfalia and Ace Ethanol (collectively, "Plaintiffs") seek a declaratory judgment, under the Declaratory Judgment Act, 28 U.S.C. § 2201, that a patent recently issued to, on information and belief, defendant GS CleanTech by the U.S. Patent and Trademark Office (the "Patent Office") for the recovery of corn oil from thin stillage is invalid. Plaintiffs also seek a declaration that any activities by Westfalia and Ace Ethanol relating to corn oil recovery do not infringe that patent. In addition, Plaintiffs seek compensatory damages for and to enjoin defendant GreenShift from continuing to engage in a bad-faith, coordinated campaign of false advertising and deceptive business practices relating to its claimed intellectual property rights.

2.       Plaintiff Westfalia is in the business of manufacturing mechanical separators -- that is, machinery used for the separation of the components of a mixture. Among the products it sells are several different types of centrifuges. Centrifuges have been used for separation purposes across a broad spectrum of American industry for more than one hundred years.

3.       More recently, Westfalia has begun to market its centrifuges in the emerging market for ethanol. The use of ethanol fuel, a renewable energy source created from the processing of feedstock like corn, is an important development in the effort to meet the nation's ever expanding energy needs.

2

4.      For the last half decade, Westfalia's centrifuges have been used by ethanol producers to separate corn oil from "condensed thin stillage," a mixture created during the ethanol production process that had until then been used for animal feed. The ability of producers to recover high-value corn oil from what would otherwise be feed has helped to grow the ethanol market by providing another revenue source to ethanol producers. Westfalia has invested substantial time and resources and applied one hundred years of its know-how to develop this market.

5.      Ace Ethanol is a Wisconsin based ethanol producer and is one of the ethanol producing companies that employs a Westfalia centrifuge to separate corn oil from condensed thin stillage. Ace Ethanol has used a Westfalia centrifuge to separate corn oil from thin stillage for over a year.

6.      This arrangement, however, is now at risk. In the last few months, Plaintiffs have been the subject of a false and misleading coordinated campaign by defendant GreenShift to trick Westfalia's customers, including Ace Ethanol, into believing that they infringed intellectual property rights claimed by GreenShift – and owed GreenShift money – when they use Westfalia's centrifuges for corn oil recovery. In truth, at the time of these accusations, GreenShift knew that neither it nor its subsidiary, GS CleanTech, possessed any enforceable patent rights.

7.      In a series of letters sent to Westfalia's customers in July 2009, including a July 15 letter sent to Ace Ethanol, GreenShift claimed that each of the customers was currently "practicing processes for recovering corn oil" in a manner that "falls squarely within the scope of the published claims of the GreenShift [patent] Applications." As a result, according to GreenShift, each of the customers "is . . . liable" to GreenShift under § 154(d) of the patent

statute for its current activities, "once these patent applications issue." The letters further suggested that the only way for the customers to avoid this existing liability was for each of them to enter into a "mutually beneficial agreement" with GreenShift to "integrat[e] GreenShift's patent pending extraction technologies into [the customer's] ethanol production facilities."

        8.     GreenShift's claims were knowingly *false*. At the time of these letters, GreenShift, a relative newcomer to the ethanol industry, was seeking patents relating to a process for extracting corn oil from thin stillage through the use of evaporation and centrifugation. But GS CleanTech, which is believed to be GreenShift's patent-holding subsidiary, had yet to receive a patent and none of the customers owed GreenShift anything for their activities. Under the patent statute, a party only can be liable for practicing an invention prior to the patent's issuance where the claims in the patent are "substantially identical" to the claims in the published patent application. By the time GreenShift's attorneys wrote to Westfalia's customers, *each* of the claims in GS CleanTech's published patent applications had been significantly narrowed, withdrawn, or canceled. Accordingly, GreenShift knew that its assertions that Westfalia's customers were liable for patent infringement were false.

        9.     Both Westfalia and Ace Ethanol have suffered a significant negative impact from GreenShift's deceptive claims. Several of Westfalia's customers blamed the company for what they erroneously believed to be their liability to GreenShift and demanded that Westfalia indemnify them. Prospective Westfalia customers likewise expressed concern that they would owe GreenShift a royalty should they buy a Westfalia centrifuge and reconsidered, or in some cases backed out of, their purchases on that basis. Ace Ethanol, on the other hand, faced an asserted legal liability should it continue its commercial and lawful practice of separating corn oil from thin stillage.

10.     GreenShift sent the July 2009 letters before the U.S. Patent and Trademark Office (the "Patent Office") had issued any patents to GreenShift or GS CleanTech relating to its claimed processes.  Since that time, on October 13, 2009, the Patent Office issued the first of these patents for corn oil recovery from thin stillage, U.S. Patent No. 7,601,858 (the "'858 Patent").

11.     With the issuance of the '858 Patent, Defendants began to enforce their claimed intellectual property rights with even greater vigor.  Indeed, in early October 2009, GreenShift sent several Westfalia customers, including Ace Ethanol, a second round of letters informing them that the '858 Patent would be issuing soon and once again threatening the customers with patent infringement.  Defendants have also sued multiple ethanol producers in various actions.

12.     But even now that the Patent Office has issued the '858 Patent, Defendants' intellectual property rights remain illusory.  That is because the idea of using evaporation and centrifugation to condense and separate liquids and solids – *i.e.,* the "innovation" claimed by the '858 Patent – is over a hundred years old.  Indeed, the prior art is replete with references to processes for separating liquids through evaporation and centrifugation.

13.     The technology claimed in the '858 Patent is, in the end, not much more sophisticated than using the spin cycle of a washing machine to extract fluid.  For this reason, the '858 Patent (and any other patents that may be issued to Defendants for recovering corn oil by similar means) is transparently invalid as lacking novelty and as obvious.

14.     Both Ace Ethanol and Westfalia have separated corn oil through evaporation followed by centrifugation and intend to continue to do so.  In addition, Westfalia

5

has previously sold and intends to continue to sell centrifuges to customers like Ace Ethanol that will be used in the corn oil recovery process.  Accordingly, given the plain unpatentability of the claims in the '858 Patent and Defendants' attempts to enforce that patent against them, Westfalia and Ace Ethanol seek a declaration now that the '858 Patent is invalid and unenforceable.

## PARTIES

15.     Plaintiff GEA Westfalia Separator, Inc. is a corporation organized and existing under the laws of New York with its principal place of business in Northvale, New Jersey.

16.     Plaintiff Ace Ethanol, LLC is a limited liability company organized and existing under the laws of Wisconsin with its principal place of business in Stanley, Wisconsin.

17.     Upon information and belief, GreenShift Corporation is a Delaware corporation with its principal place of business in New York, New York.  Upon information and belief, GreenShift regularly transacts business within this district.

18.     Upon information and belief, GS CleanTech Corporation is a Delaware corporation with its principal place of business in New York, New York.  Upon information and belief, GS CleanTech is a wholly-owned subsidiary of GreenShift Corporation and is the owner by assignment of the '858 Patent.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 15 U.S.C. § 1121(a) (action arising under the Lanham Act); 28 U.S.C. § 1338(a) (actions arising under the patent laws); and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

20.     Venue is proper in the Southern District of New York district pursuant to 28 U.S.C. § 1391(b) and (c).

## FACTS

### The Businesses of Westfalia and Ace Ethanol

21.     Plaintiff Westfalia has been in the business of manufacturing products for use in mechanical separation since 1893, when it constructed the first milk centrifuge.  Today, it is a leader in the area of mechanical separation technology.

22.     Mechanical separation is the process by which the components of a mixture are separated through the use of mechanical methods (*i.e.*, acceleration of nature's gravitational force) into two or more products with differing characteristics.  As part of its mechanical separation business, Westfalia manufactures a variety of different types of centrifuges.  Centrifuges, generally, are pieces of equipment driven by an electric motor that rotate material around a fixed axis.  The gravitational forces produced by this rotation allow components of a mixture to separate.

23.     Westfalia's centrifuges are used across a broad cross-spectrum of industry.  For example, the company's centrifuges are used by the dairy industry in the production of milk and cheese, and by the beverage industry to make beer, wine, juices, coffee, and teas.  The products also play a role in the processing of various types of oils and fats, including corn, canola, and olive oils.  The chemical and pharmaceutical industries utilize Westfalia's centrifuges for the manufacture of antibiotics, vaccines, and paints, while the energy industry has called upon the company's products for the exploration, delivery, and treatment of crude oil and natural gas.  In short, Westfalia's products have long played a vital role in the

production of everything from the food on our tables to the drugs in our medicine cabinets to the oil in our cars.

24.     In 1998, Westfalia determined to market its centrifuges in North America for yet another use: for the production of ethanol by the new and evolving biofuel industry. Westfalia recognized the environmental, societal, and commercial potential of ethanol more than a decade ago and targeted its products to the growing industry.

25.     Ethanol is a renewable energy source created from the processing of feedstock, such as sugar cane, wheat, or corn. Scientists have long recognized its potential use as a fuel alternative to conventional gasoline. In addition, ethanol may be used as a fuel additive by combining it with conventional gasoline as an oxygenate to reduce carbon dioxide emissions.

26.     In recent years, consumers and industry alike have become increasingly intrigued by the potential of ethanol as an alternative to traditional fuels. Ethanol is seen by many as offering several distinct advantages to conventional fuels. For one, the biofuel is clean-burning, so it helps reduce carbon dioxide emissions and associated environmental impacts such as the "greenhouse effect," urban smog, and the destruction of the earth's ozone layer. In addition, since it is created from feedstock like corn, ethanol can help foster American energy independence and assist in reducing the nation's reliance upon crude oil imports. The growth in the ethanol industry also is seen as a boon to the nation's agrarian economy given its potential to help create jobs for farmers and other agricultural workers.

27.     Plaintiff Ace Ethanol is a producer of ethanol and one of Westfalia's centrifuge customers. Ace Ethanol was founded in 2001 and has been producing ethanol since June of 2002. At that time, the company was the only large scale ethanol producer in the state of Wisconsin.

8

28.     At the center of Ace Ethanol's business is its ethanol production plant located in Stanley, Wisconsin.  That ethanol plant cost Ace Ethanol over $31 million to build and, with improvements, the company has invested more than $50 million in the plant.

29.     The product of that considerable investment is a plant that mills approximately 14 million bushels of corn annually to produce about 40 million gallons of ethanol every year.  In addition, the plant is designed to capture commercially valuable waste products such as 350 tons per day of distiller's grains, a high protein corn product used for animal feed, and 140 tons per day of carbon dioxide, used to produce liquid $CO_2$ and dry ice.  In short, Ace Ethanol has designed its plant to maximize production and minimize waste.

## Background on Corn Oil Recovery

30.     The production of ethanol begins with alcohol fermentation.  All alcohol fermentation uses raw materials containing sugar and starch, such as corn, wheat, barley, rye and molasses, as the starting products.  In the United States, ethanol producers like Ace Ethanol typically use corn because of its abundance.

31.     While the glucose in plants containing sugar is fermented directly, the starch in corn must first be converted into sugar using enzyme action.  There are a few different processes for converting starch into sugar for fermentation, including what is known as "dry milling."

32.     In the dry milling process, corn is ground and mixed with water, the pH value is adjusted, and enzymes are added that convert the starch into simple sugars.  This sugar mixture is fermented with yeast, which produces a broth containing alcohol.  The fermentation broth is then distilled to separate the raw alcohol from the non-fermentable solids known as "whole stillage."  The raw alcohol can then be further processed to produce ethanol.

9

33.    The whole stillage can next be further separated into its constituents known as "thin stillage" and "solids cake" in a clarifying decanter (a type of centrifuge), such as those sold by Westfalia. The solids cake contains the coarse constituents of the original grain. The thin stillage contains oil and other components.

34.    Historically, the thin stillage was evaporated into a condensed form and mixed with the solids cake. This mixture was then dried into a product that is often sold as animal feed. By 2005, in an effort to make ethanol production more competitive, Westfalia applied its know-how and expertise to recover further corn oil from the condensed thin stillage through the use of the company's centrifuges. The use of the centrifuge allows producers like Ace Ethanol to recover corn oil from the condensed thin stillage, rather than simply selling the byproduct as animal feed.

35.    The process for recovering corn oil from the condensed thin stillage is done by first evaporating some amount of water from the thin stillage to form a more concentrated thin stillage ("condensed thin stillage"). This condensed thin stillage is then passed through a centrifuge, which separates the concentrate into oil and a de-oiled syrup.

36.    The corn oil from this process can be recovered and used or sold for any number of applications, including biodiesel production. Given the revenue stream corn oil recovery adds to ethanol production, many of Westfalia's ethanol-producing customers have purchased centrifuges for the purpose of supplementing their then-existing ethanol production plants with technology capable of taking advantage of the possibility of oil recovery. Many other participants in the ethanol-production market have expressed interest in similarly upgrading their plants.

10

37.     As of the date the Plaintiffs filed their original complaint, Westfalia had sold twenty-nine centrifuges designed for corn oil recovery to twenty different ethanol plants across the country.  These deals have resulted in over $15 million in total sales for Westfalia.  At the time GreenShift sent threatening letters to Westfalia customers, the company was negotiating the sale of more than twenty additional machines.

38.     Ace Ethanol is one of Westfalia's centrifuge customers.  Since August 2008, Ace Ethanol as part of its regular business operations has recovered corn oil by first evaporating water from thin stillage and then passing the resulting condensed thin stillage through a centrifuge purchased from Westfalia.

### The GreenShift Patent Application Process

39.     Defendant GreenShift is a relative newcomer to the corn oil recovery business.  Until recently, according to its 2008 SEC Form 10-K, the company was known as KBF Pollution Management, Inc. or Veridium Corporation and was primarily focused upon the extraction of metals from industrial waste for sale to third-party smelters and refineries.  These efforts ultimately proved commercially unsuccessful and the company shifted gears to energy production.

40.     Upon information and belief, in or about 2005, the company re-branded itself with a new name, "GreenShift," and a new business model.  Now, the company was in the business of "develop[ing] and commercializ[ing] clean technologies that facilitate the efficient use of natural resources" with a focus on "developing and using innovative technologies to produce biofuel and other biomass-derived products."  Among its chief assets, according to its annual report, was Greenshift's patent-pending process for extracting corn oil.

41.     Upon information and belief, GreenShift through its subsidiary GS CleanTech holds the intellectual property rights to at least two processes for the extraction of corn oil through an arrangement between the company and the inventor of the processes, David Cantrell ("Cantrell"). Beginning in May 2005, Cantrell sought patent protection for these processes with the U.S. Patent Office. As reflected below, the application process for those claimed innovations resulted in numerous changes to the filed claims, so that, by the end, every one of the claims in the original patent application was substantively narrowed by the Patent Office.

42.     On October 13, 2009, Cantrell received patent protection for one of these processes, the '858 Patent. Cantrell's application for a second process for corn oil recovery is still pending with the Patent Office.

*The '859 Application*

43.     On May 5, 2005, Cantrell filed a patent application entitled "Method of Processing Ethanol Byproducts and Related Subsystems." This patent application was assigned serial number 11/122,859 ("the '859 Application"). Upon information and belief, in or about July 2005, GreenShift created Mean Green Biofuels Corporation to maintain the rights to the processes covered by the patent application and named Cantrell as the Chairman and Chief Executive Officer of the newly-formed subsidiary. Upon information and belief, these rights are now held by GS CleanTech.

44.     The '859 Application, as originally filed, contained 30 claims, including 7 independent claims.

45.     Claim 1 of the '859 Application, as originally filed, read: "1. A method of processing a concentrated byproduct of a dry milling process for producing ethanol, comprising

12

recovering oil from the concentrated byproduct." '859 Patent Application, Original Claims of May 5, 2005 at 14.

46.     Dependant Claim 2 of the '859 Application, as originally filed, read: "2. The method of claim 1, wherein the byproduct comprises thin stillage, and the method further includes the step of evaporating the thin stillage to form the concentrated byproduct having a moisture content of greater than 15% and less than about 90% by weight before the recovering step." *Id.*

47.     The originally filed claims of the '859 Application were published on February 23, 2006 as United States Patent Application Publication Number US 2006/0041152 ("the '152 Publication").

48.     On March 5, 2008, Cantrell amended claims 1 and 2 of the '859 Application. '859 Application, Amendment and Response to Extension Request of March 5, 2008 at page 2. A new claim 31 was also added. *Id.* at 5-6.

49.     Claim 1 was amended to read: "1. (Currently Amended) A method of processing a concentrated byproduct comprising concentrated thin stillage of a dry milling process for producing ethanol, comprising recovering oil from the concentrated byproduct thin stillage." *Id.* at 2. (alterations in original).

50.     Claim 2 was amended to read: "2. (Currently Amended) The method of claim 1, wherein the byproduct comprises thin stillage, and the method further includes the step of evaporating the thin stillage to form the concentrated byproduct having a moisture content of greater than 15% and less than about 90% by weight before the recovering step." *Id.* (alterations in original).

13

4397760v.2

51.     On June 13, 2008, the Patent Examiner withdrew claims 22-30 of the '859 Application from consideration as being drawn to a nonelected invention.  '859 Application, Office Action of June 13, 2008 at 2.  Claims 1-21 were rejected as obvious under 35 U.S.C. 103(a) "as being unpatentable over Prevost et al. (U.S. 2004/0087808) in view of Yokoyama et al. in further view of Singh et al."  *Id.* at 3.  As the Examiner noted at that time, "it would have been obvious to one of ordinary skill in the art at the time the claimed invention was made to recover oil from stillage that is the by-product of ethanol production as suggested by Prevost et al. and Yokoyama et al. by heating the stillage prior to oil extraction."  *Id.* at 5.

52.     In an effort to traverse this rejection, Cantrell amended claims 1, 2, 3, 9, 14, 16, and 31 and canceled claims 8, 10, 11, 12 and 13 on September 15, 2008.  '859 Patent Application, Amendment and Response of September 15, 2008 at 2-5.  All of the independent claims in the '859 application were either amended or canceled.  *Id.*

53.     For example, claim 1 was amended to read: "1. (Currently Amended) A method of recovering oil from thin stillage, the method comprising, in sequence: evaporating the thin stillage to remove water and form a concentrated byproduct; and processing a concentrated byproduct of a dry-milling process comprising concentrated thin stillage for producing ethanol, comprising recovering oil from the concentrated byproduct by heating and mechanically processing the concentrated byproduct to separate the oil from the concentrated byproduct to separate the oil from the concentrated byproduct."  *Id.* at 2 (alterations in original).

54.     Similarly, claim 2 was amended to read: "2. (Currently Amended) The method of claim 1, wherein the method further includes the step of evaporating the thin stillage to form the concentrated byproduct having has a moisture content of greater than 15% and less than about 90% by weight.before the recovering step."  *Id.* (alterations in original)

14

55.    By virtue of the September 15, 2008 amendments to the remaining independent claims (1, 14, 16, and 31), *all* remaining claims are now (and were as of September 15, 2008) substantially different from those in the published application.

56.    On December 22, 2008, the Patent Examiner issued a final rejection to all remaining claims of the '859 Application. '859 Application, Office Action of December 22, 2008. According to the Examiner, "it would have been obvious to one of ordinary skill in the art at the time the claimed invention was made to recover oil from any from [*sic*] of wet stillage resulting from the production of ethanol as suggested by Minowa et al. and then include centrifugation as suggested by Prevost et al. to aid in oil removal form [*sic*] the stillage for recovery of oil from stillage resulting from ethanol production." *Id.* at 5.

57.    In order to traverse the objection for obviousness, Cantrell canceled claim 2 and amended claims 1, 14, and 16 to each require that oil is recovered from either a concentrate or concentrated byproduct having a moisture content of greater than 30% and less than 90% by weight. '859 Application, Amendment after Final of February 3, 2009 at 2-3.

58.    As amended as of February 3, 2009, claim 1 read: "1. (Currently Amended) A method of recovering oil from thin stillage, the method comprising, in sequence: evaporating the thin stillage to remove water and form a concentrated byproduct; and recovering oil from the concentrated by product by heating and mechanically processing the concentrated byproduct to separate the oil from the concentrated byproduct, wherein the concentrated byproduct has a moisture content of greater than 30% and less than 90% by weight." *Id.* at 2 (underlining in original).

59.    . In support of the application, Cantrell argued "Minowa in combination with Prevost fails to teach or suggest a method of recovering oil from thin stillage comprising

evaporating the thin stillage to remove water and form a concentrated byproduct; and recovering oil from the concentrated byproduct by heating and mechanically processing the concentrated byproduct to separate the oil from the concentrated byproduct, wherein the concentrated byproduct has a moisture content of greater than 30% and less than 90% by weight." *Id.* at 10-11.

60.     By virtue of the amendments of February 3, 2009, every published claim that had not already been canceled, other than claim 9, was further substantively narrowed (beyond the amendments of September 15, 2008) so that each was now only directed to processes using concentrated byproducts with moisture contents greater than 30% by weight.

61.     The Examiner allowed the remaining claims (1-3, 7, 9, 14-21, and 31) on April 8, 2008. '859 Application, Notice of Allowability of April 8, 2009.

62.     Cantrell then withdrew his claims from issue on June 5, 2009. '859 Application, Petition for Withdrawal from Issue of June 5, 2009.

63.     These same claims were then allowed once again on August 25, 2009. '859 Application, Notice of Allowance of June 5, 2009. By then, *each and every one* of the allowed claims was substantially different from any claim published in the '152 Publication.

64.     On October 13, 2009, the Patent Office issued the '858 Patent based on the '859 Application.

*The '231 Application*

65.     The same day he filed the '859 Application, Cantrell also filed a second patent application entitled "Method of Processing Ethanol Byproducts and Related Subsystems." This patent application was assigned serial number 11/241,231 ("the '231 Application").

66.     The '231 Application was published on February 23, 2006 as United States Patent Application Publication Number US 2006/0041153 ("the '153 Publication").

67.     Like the '859 Application patent claims, all of the published claims of the '231 Application were substantively narrowed in scope during the patent application process.

68.     For example, claim 31 of the '231 Application, as originally published, was exceedingly broad in scope: "31. A method of processing a concentrated byproduct of a dry milling process for producing ethanol, comprising recovering oil from the concentrated byproduct using a disk stack centrifuge." '153 Publication at 3.

69.     During the application process, however, the claim was amended and substantively narrowed: "31. (Currently Amended) A method of <u>recovering oil from thin stillage; the method consisting essentially of, in sequence: evaporating water from the thin stillage to form a thin stillage concentrate; mechanically processing the thin stillage concentrate to separate oil from the thin stillage concentrate; and</u> ~~processing a concentrated byproduct of a dry milling process for producing ethanol, comprising~~ recovering <u>the separated</u> oil ~~from the concentrated byproduct using a disk stack centrifuge~~." '231 Patent Application, Amendment and Response of September 16, 2008 at 2 (alterations in original).

70.     Similar substantive modifications were made in all of the remaining claims in the '231 Application. *Id.* at 2-5.

71.     In addition, all of the claims in the '231 Application other than claim 39 were further substantively narrowed in scope during the patent application process to require a moisture content of greater than 30%. '231 Patent Application, Amendment and Response of February 3, 2009 at 2-4.

72.     As drafted today, each and every one of the claims of the '231 Application is substantially different from any claim published in the '153 Publication.

73.     As of the date of this Amended Complaint, the Patent Office has yet to issue a patent for the claims covered by the '231 Application.

## GreenShift's False Advertising

74.     Defendants' venture into the corn oil recovery business has yet to pay dividends, as GreenShift has continued to be operated at a loss.  According to its public filings, for the year ended December 31, 2008, for example, GreenShift incurred a loss of nearly $50 million.  The prior year, GreenShift had suffered a loss of approximately $25 million.  As of the end of 2008, GreenShift maintained less than $290,000 in assets while carrying liabilities of over $61 million.  Not surprisingly, GreenShift was forced to disclose in its 10-K filing that its "external auditors have included an explanatory paragraph in their audit report raising substantial doubt as to the Company's ability to continue as a going concern due to the Company's history of losses, working capital deficiency and cash position."

75.     Perhaps as a result of this perilous financial condition, in recent months, GreenShift has foregone any effort to compete fairly in the marketplace for corn oil recovery and instead has launched a coordinated campaign of deception and intimidation.  This multi-year campaign has been marked by bad-faith, false assertions by GreenShift that Westfalia customers were liable for practicing the processes allegedly covered by the '859 and '231 Applications even though, at the time of these allegations, the Patent Office had yet to issue to any patents covering these processes—and further, had narrowed each of the claims such that GreenShift knew it would not be entitled to pre-issuance royalties.

18

76.     Ace Ethanol was among the Westfalia customers targeted by GreenShift. This campaign has resulted in significant competitive injury to Westfalia, Ace Ethanol, and other Westfalia customers.

77.     The first known instance of GreenShift attempting to intimidate customers of Westfalia through false representations about its claimed patent rights occurred in or about 2005, when representatives of a GreenShift-related company threatened to sue for "patent infringement" at least one company that was considering purchasing equipment for corn oil recovery from Westfalia. GreenShift's claims of infringement were wholly without merit given that the Patent Office had yet to patent its processes. At the time, Westfalia explicitly *warned* GreenShift not to misrepresent its patent rights.

78.     More recently, in or about February and March 2009, a representative of GreenShift approached several of Westfalia's customers and informed the customers that GreenShift's pending patents for corn oil recovery would soon be approved by the Patent Office. Upon information and belief, in connection with these visits, the GreenShift representative pressed the ethanol producers to enter into a licensing agreement with GreenShift whereby the customers would pay GreenShift a royalty for permission to practice the processes covered by the '859 and '231 Applications. In at least one instance in April 2009, GreenShift sent a letter to one of the entities using a Westfalia centrifuge for corn oil recovery and asserted that the recovery process was covered by GreenShift's existing intellectual property rights. As of the time of these contacts between GreenShift and Westfalia's customers, the Patent Office had yet to approve the '859 and '231 Applications.

79.     When Westfalia's customers failed to respond to GreenShift's requests for licenses, GreenShift stepped up its campaign. On July 15-16, 2009, GreenShift's outside counsel

19

Cantor Colburn LLP sent letters to at least six of Westfalia's existing corn oil recovery customers to inform them that they were allegedly "liable" to GreenShift for practicing the processes covered by the then-pending '859 and '231 Applications (collectively, the "July Letters"). Ace Ethanol was again among the companies targeted by GreenShift.

80. Although Plaintiffs do not know at this time exactly how many of Westfalia's customers and prospective customers received these letters, at least *thirty percent* of the company's existing customers were targeted by GreenShift.

81. The July Letters are each identical (except for the name of the addressee). The July 15, 2009 letter to Neal Kemmet, Ace Ethanol's President and General Manager, is reflective of the letters:

> This firm represents GreenShift Corporation ("GreenShift") in patent, trademark, and related intellectual property matters. *A very serious matter has recently been brought to our attention.*
>
> GreenShift is the owner of U.S. Patent Application Publication No. 2006/0041152 (the "152 application"), which published on February 23, 2006; and U.S. Patent Application Publication No. 2006/0041153 (the "153 application"), which published on February 23, 2006, among others, which shall be collectively referred to herein as the "GreenShift Applications". Copies of the above identified GreenShift Applications are enclosed for your review.
>
> *It has come to our attention that ACE Ethanol, LLC may be practicing processes and/or installing systems for recovering corn oil that may fall within the scope of the published claims of the GreenShift Applications.*
>
> Specifically, we have been advised that ACE Ethanol, LLC has installed systems and/or is practicing processes for recovering corn oil from thin stillage by concentrating the thin stillage to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge. The system is believed to include an evaporator for evaporating the thin stillage to form the concentrate; and a centrifuge for receiving the concentrate and recovering oil therefrom. *This activity falls squarely within the scope of the published claims of the GreenShift Applications.*

20

*ACE Ethanol, LLC is thus liable under 35 U.S.C. § 154(d) once these patent applications issue.*

The United States Patent Laws provide in 35 U.S.C. § 154(d):

> "(1) IN GENERAL.- In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued
>
> > (A)     (i) makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; [and] ....
> >
> > (B)     had actual notice of the published patent application...."

This letter constitutes actual notice of the published GreenShift Applications and we request you carefully consider these published applications in your immediate and future business plans. *If, after reviewing these published applications, you are interested in integrating GreenShift's patent pending extraction technologies into your ethanol production facilities under a mutually beneficial agreement,* please contact GreenShift's Chief Technology Officer, Mr. David Winsness at (410) 916-1800 for further details.

Please contact me should you have any questions and/or concerns.

(Emphasis added.)

82.     As reflected above, in the July Letters, GreenShift's counsel informed Ace Ethanol and the other Westfalia customers of GreenShift's then-pending patent applications for the recovery of corn oil.  Greenshift's attorney then asserted that each customer's process for recovering corn oil "falls squarely within the scope of the published claims of the GreenShift Applications."  As a result, according to GreenShift's counsel, the ethanol producer "*is thus liable* under 35 U.S.C. § 154(d) once these patent applications issue." (Emphasis added.)  The

21

4397760v.2

July Letters then quoted § 154(d)(1) of the patent statute, but tellingly, made no reference to § 154(d)(2) of the statute.[1]

83.     The penultimate sentence of the July Letters make plain the true commercial purpose of the communication: "If, after reviewing these published applications, you are *interested in integrating GreenShift's patent pending extraction technologies* into your ethanol production facilities under a *mutually beneficial agreement*," contact GreenShift's chief technology officer to discuss the details. (Emphasis added.). In other words, agree to pay GreenShift a fee to license its claimed processes or be held liable for infringement.

84.     As GreenShift and its representatives knew at the time they sent the July Letters, the claims in the letters were false. When GreenShift sent the letters to Ace Ethanol and the other Westfalia customers it was untrue that the recipient of the letter "is . . . liable" for engaging in the corn oil recovery processes allegedly covered by the then-pending '859 and '231 Applications.

85.     Section 154(d) of the patent statute provides certain limited "provisional rights" to the party seeking a patent prior to its being issued by the Patent Office. Under that section, "a patent shall include the right to obtain a reasonable royalty from any person, who during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued" uses the invention as it is claimed in the published patent application despite actual notice of the application. 35 U.S.C. § 154(d)(1). In other words, an entity that uses the invention covered by a patent application while the application is pending may be liable for a "reasonable royalty" for its pre-issuance use after the patent is issued by the Patent Office.

---

[1] As discussed below, GreenShift repeated these claims in an October 7, 2009 letter to Ace Ethanol and at least three other Westfalia customers.

86.     The next subsection of the patent statute, however, significantly limits these provisional rights:

> The right under paragraph (1) [*i.e.*, 35 U.S.C. § 154(d)(1)] to obtain a reasonable royalty *shall not be available* under this subsection unless the invention as claimed in the patent is *substantially identical* to the invention as claimed in the published patent application.

35 U.S.C. § 154(d)(2) (emphasis added).  Accordingly, unless the claims in the published patent application are "substantially identical" to the claims in the ultimate patent, the party is not liable for a royalty for its use of the invention prior to the patent's issuance.

87.     A claim in a patent application is only substantially identical to that in the final issued patent if the claim is issued without any substantive change.  If the scope of a claim has been modified in any way – that is, the claim has been narrowed between the time of the application and the patent's ultimate approval – the claim is not "substantially identical" for purposes of the patent statute and the patent holder does not retain any provisional rights.

88.     When GreenShift sent the July letters to Ace Ethanol and the other Wesfalia customers, the Patent Office had yet to issue the '858 Patent.  The '858 Patent would not be issued for another three months.  Moreover, as discussed above, in order to gain patent approval, the applicants were required to substantively modify *each and every one* of the claims in the patent applications.  Indeed, *all of the claims had been substantively modified* by the time GreenShift sent the July Letters to Westfalia's customers, such that GreenShift could not—and did not—believe that the issued claims were "substantially identical" to those in the published applications, as required for pre-issuance royalties under § 154(d).

89.     For example, claim 1 of what is now the '858 Patent was exceedingly broad in scope when it was originally published in the patent application on February 23, 2006,

23

purporting to cover *any* process for recovering corn oil from the byproduct of the ethanol dry milling process:

> 1. A method of processing a concentrated byproduct of a dry milling process for producing ethanol, comprising recovering oil from the concentrated byproduct.

The '152 Publication at 3.

90.     Claim 1 as contained in the '858 Patent – and in the form it has existed at all times since February 3, 2009 – is substantially narrower:

> 1. A method of recovering oil from thin stillage, the method comprising, in sequence: evaporating the thin stillage to remove water and form a concentrated byproduct; and recovering oil from the concentrated byproduct by heating and processing the concentrated byproduct to separate the oil from the concentrated byproduct, wherein the concentrated byproduct has a moisture content of greater than 30% and less than 90% by weight.

'859 Application, Amendment after Final of February 3, 2009 at 2 (alterations removed).  As issued, claim 1 only covers the recovery of corn oil from thin stillage where the stillage is first evaporated and then the oil is recovered from the byproduct by heating and processing to a specified moisture content.

91.     As allowed, therefore, claim 1 of the '858 Patent is not "substantially identical" to how it appeared in the published patent application.  Likewise, as set forth above, the remainder of the claims in the '858 Patent, as well as the claims in the '231 Application as it is now drafted, are not currently – and have not been since at least February 2009 – "substantially identical" to how they appeared in the published application.  Thus, the inventions as set forth in the '858 Patent and the '231 Application are not substantially identical to the inventions as claimed in the '152 and '153 Publications, respectively.

92.     Accordingly, GreenShift and its representatives knew when they sent the July Letters that the company was not entitled to a royalty under the provisional rights section of

24

the patent statute. For this reason, the claim in the July Letters that each Westfalia's customers "is . . . liable" for its actions prior to the issuance of Defendants' patents was made in bad faith, as it was knowingly false when made and remains false today.

93.    Likewise, the quotation of § 154(d)(1) of the patent statute in the July Letters was false in context. By quoting this section without referencing the corresponding requirement of substantial identity imposed by § 154(d)(2), GreenShift necessarily implied to the recipient of the letters – by and large producers of ethanol not versed in the nuances of patent law – that the patent statute's grant of royalty rights in advance of patent approval was unconditional. Upon information and belief, this implication was both intentional and knowingly false and was designed to pressure Ace Ethanol and the other Westfalia customers into paying a royalty fee to GreenShift for practicing the claimed processes prior to any patents being issued.

94.    In light of the above, on August 4, 2009, counsel for Westfalia wrote to GreenShift's attorneys to request that "GreenShift and its principals discontinue representing that GreenShift's patent applications may lead to liability under 35 U.S.C. § 154(d)." This was the *second time* that Westfalia asked GreenShift to stop misrepresenting its patent rights. Neither GreenShift nor its attorneys have responded to this letter.

95.    GreenShift received a similar letter from ICM, a designer and builder of ethanol production plants whose customers had been similarly threatened, just two days later. ICM's August 6, 2009 letter explained that GreenShift's assertion of liability under 35 U.S.C. § 154(d) was false and misleading in light of 1) its selective omission of § 154(d)(2); and 2) the material amendments to GreenShift's patent claims that clearly precluded liability under that section. Once again, GreenShift failed to respond.

96.     Despite these multiple warnings, GreenShift has persisted in intimidating Westfalia customers through yet *another* round of threatening letters and, in conjunction, made knowingly false and hyperbolic comments in its press releases. *See, e.g.*, GreenShift Press Release, October 14, 2009, *available at* http://www.greenshift.com/news.php?id=248 ("There are no other technologies that have been developed for corn ethanol producers that begin to approach even a fraction of these results in the entire history of the ethanol industry.")

### Harm to Plaintiffs from GreenShift's False Advertising

97.     GreenShift's false and deceptive communications are material to the purchasing decisions of Westfalia's present and prospective customers and have injured – and will continue to injure if unabated – both Westfalia and its customers, including Ace Ethanol.

98.     The recipients of the July Letters, including Ace Ethanol, have each purchased centrifuges from Westfalia for corn oil recovery. The corn oil recovery business is a relatively circumscribed industry with a fairly small profit margin. Given this small profit margin, it is a significant burden for customers of Westfalia, such as Ace Ethanol, to pay a royalty for practicing the obvious and unpatentable processes covered by the then-pending '859 and '231 Applications.

99.     After receiving the July Letters, several of Westfalia's customers expressed their displeasure to Westfalia that they were not warned that they were liable for engaging in these recovery processes even prior to the approval of the '859 and '231 Applications. Despite their falsity, the claims in the July Letters have strained Westfalia's relationship with its customers, resulting in a loss of the company's goodwill. Some of Westfalia's customers apparently are so concerned about the claims levied in the July letters that they have demanded that Westfalia indemnify them should they be held liable for any royalties they allegedly owe to GreenShift. For example, in a July 20 letter, an attorney for one

26

Westfalia's existing customers "demand[ed] that Westfalia immediately indemnify, hold harmless and defend [the customer] against any and all claims for damages, royalties, costs, expenses and counsel fees, of any kind arising out of this claim by GreenShift" and "reserve[d] all rights and remedies [against Westfalia], legal and equitable."

100.    Westfalia's relationship with its prospective customers has similarly been impaired. Given the small size of the existing corn oil recovery market, upon information and belief, prospective customers have likewise learned of GreenShift's false claims and may be deterred from purchasing corn oil recovery equipment from Westfalia out of fear they will be required to pay a license to GreenShift, including for activities undertaken even prior to the patents being issued. Indeed, several prospective customers have voiced concern to Westfalia about their potential liability to GreenShift should they buy one of Westfalia's centrifuges and either have delayed their purchases or demanded that Westfalia indemnify them.

101.    Ace Ethanol has likewise been harmed by GreenShift's false and deceptive conduct. Ace Ethanol was subjected to threats by GreenShift's lawyers that it faced legal liability by continuing to conduct its corn oil recovery business notwithstanding that, at the time of the threats, GreenShift had no patent rights. Upon information and belief, these threats were made in bad faith and were intended to dupe Ace Ethanol, and the other targeted ethanol companies, into entering into a licensing arrangement with GreenShift under false pretenses – namely, the fictitious threat of liability for practicing these processes prior to the issuance of the patents.

102.    Some of the injury to Plaintiffs as a result of GreenShift's actions is measurable and compensable by damages. Much of the injury, however, is irreparable and leaves Plaintiffs with no adequate remedy at law.

27

## The Invalidity of GreenShift's Patent Claims

103.    GreenShift's bad-faith false advertising campaign is all the more egregious given that the technology that underlies this campaign has long been within the public domain and thus any patent covering these processes should be declared invalid when challenged.

104.    As referenced above, the Patent Office issued the '858 Patent on October 13, 2009, while the '231 Application is still pending.  Notwithstanding the issuance of the '858 Patent, the claims in that patent still suffer from significant deficiencies that require their invalidation.  In particular, the claims lack novelty under 35 U.S.C. § 102 and constitute at most a trivial change from long-existing technologies and thus fail the requirement that they be non-obvious under 35 U.S.C. § 103.

105.    The claims in the pending '231 Application also suffer from these same defects, so that any prospective patent that may issue covering these claims will likewise be invalid.

106.    The art of using evaporation and centrifugation to separate liquids from solids is nothing new.  Indeed, anyone who has ever operated a washing machine and a dryer has utilized a process of liquid separation that involves heating and centrifugation.

107.    The separation of oils from other liquids for the purposes of oil recovery has also been known in the art for decades.  The first separator for the recovery of fish oil was commissioned back in 1929.  Since then, Westfalia has developed, manufactured and delivered scores of centrifuges for the fish oil industry while at the same time successfully and innovatively optimizing the processes.  For at least twenty-five years, the fish oil recovery process has involved using the byproduct that is left over after a fish has been filleted.  These waste products are then, in sequence, crushed, heated, and separated into oils, liquids and solids

28

in a centrifuge. After separation in the centrifuge, the liquid stream is concentrated by evaporation. The concentrated liquid stream is then typically heated and then processed in a second centrifuge to recover fish oil from the concentrated liquid. This process is substantially identical to the claims contained in the '858 Patent and in the '231 Application.

108.   Similar methods have also been used for animal fat recovery and for the separation of fat in dairy products.

109.   In fact, the process of using evaporation and centrifugation techniques to recover oil from thin stillage – the very processes described in the '858 Patent and the '231 Application – were in existence prior to Cantrell's purported invention. Even Cantrell has acknowledged that the prior art taught the combination of evaporation and centrifugation technologies.

110.   Thus, the invention claimed in the '858 Patent is not novel and, therefore, is unpatentable pursuant to 35 U.S.C. § 102. In addition, using plain common sense, a person having skill in the art of oil recovery would have known how to apply these known techniques to achieve Cantrell's claimed invention. Accordingly, the '858 Patent is invalid pursuant to 35 U.S.C. § 103. Likewise, the claims covered by the '231 Application should be declared invalid if those claims are ever patented. In addition, any process for oil recovery from thin stillage involving the steps of centrifuging and evaporating performed in any order is fully within the public domain.

**Actual Controversy Concerning GreenShift's Patent**

111.   In the July 2009 Letters sent to Ace Ethanol and the other Westfalia customers, GreenShift made clear its intention to enforce its patent rights once the patents issued. Now that the '858 Patent has issued and, on information and belief, was assigned to GreenShift's

29

wholly-owned subsidiary, GS CleanTech, GS CleanTech has made good on GreenShift's prior threats to prosecute any entities that recover corn oil from thin stillage through, in sequence, evaporation and centrifugation.

112.    Greenshift has on multiple occasions asserted that practicing processes for recovering corn oil involving concentrating thin stillage by evaporation to create a thin stillage concentrate, followed by separating the oil from the concentrate using a centrifuge falls squarely within the scope of activities that would be protected by their patent claims upon patent issuance.

113.    Indeed, as recently as a week prior to the filing of Westfalia's First Amended Complaint, GreenShift *once again* threatened Ace Ethanol with liability for infringement once the patents issued.  In an October 7, 2009 letter to the company, GreenShift's attorneys repeated its claim that Ace Ethanol "is . . . liable" under § 154(d) of the patent statute for "practicing processes and/or installing systems for recovering corn oil" that fall within the scope of the patent claims.  Tellingly, GreenShift continued to make the same baseless, bad-faith claim notwithstanding Westfalia counsel's prior warnings that GreenShift had no basis for claiming any liability on the part of Westfalia customers.  Unlike the earlier letters from July, however, the October 7 letter also advised that "several claims from the '152 application [the '859 Application] have been allowed by the U.S. Patent and Trademark Office and will issue as a U.S. Patent in the near future."  The letter further warned Ace Ethanol that anyone who "uses any patented invention within the United States during the term of the patent *infringes the patent*" and is liable for "*[d]amages for infringement*," including potentially "*up to three times the amount* found or assessed." (Emphasis added.)  Once again, the letter concluded by suggesting a "mutually beneficial arrangement" to "integrat[e] GreenShift's patent pending extraction technologies into [Ace Ethanol's] ethanol production facilities" in order to avoid this liability.

114.    Upon information and belief, a least three other Westfalia customers received identical letters from GreenShift's attorneys dated October 7, 2009. In addition to these letters, at least one prospective Westfalia customer received a telephone call from a GreenShift representative in early October 2009 in which the representative conveyed a similar message to that contained in the letters (*i.e.*, that GreenShift would be receiving a patent shortly and that after that time any companies recovering corn oil would be infringing GreenShift's patent).

115.    The import of these communications is obvious: with the issuance of the '858 Patent on October 13, 2009, Defendants are vigorously pursuing their claimed intellectual property rights against any entities, including explicitly Ace Ethanol, that they believe practices the processes covered by the patent. As of this date, Defendants have in fact sued 20 ethanol producers in various actions, and have requested damages under 35 U.S.C. § 154(d).

116.    Plaintiffs have engaged in and will continue to engage in activities that they reasonably fear Defendants will allege infringe the '858 Patent.

117.    Since August 2008, Ace Ethanol has engaged in a process whereby corn oil is recovered by first evaporating the thin stillage and then passing the resulting condensed thin stillage through a centrifuge.

118.    Similarly, for the last half decade, Westfalia has sold centrifuges that have, on information and belief, been used by ethanol producers to separate corn oil from thin stillage by first evaporating the thin stillage and then subjecting the condensed thin stillage to centrifugation. In addition, on September 24, 2009, Westfalia itself tested a process for corn oil recovery through evaporation and then centrifugation. Westfalia intends to do so again in the near future.

31

119.    Plaintiffs seek prompt resolution on the questions of invalidity and infringement in order to prevent avoidable damages from being incurred.

120.    The totality of circumstances, including GreenShift's recent efforts to assert intellectual property rights against Ace Ethanol and the other Westfalia customers and Plaintiffs' own corn oil recovery activities to date, and especially the action for patent infringement filed by GS CleanTech against Plaintiffs (*GS CleanTech Corporation v. GEA Westfalia Separator, Inc., et al.*, Civil Action No. 09-cv-08642-LMM) in the Southern District of New York demonstrate that there is an actual case or controversy concerning whether the '858 Patent is valid and, if so, whether Plaintiffs' activities infringe that patent.

## FIRST CLAIM FOR RELIEF

### (Declaration of Invalidity of U.S. Patent No. 7,601,858)

121.    Plaintiffs repeat and reallege paragraphs 1 through 120 above with the same force and effect as if fully set forth herein.

122.    There is an actual and justiciable controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, between Plaintiffs and Defendants concerning the validity of the claims of the '858 Patent.

123.    The claims of the '858 Patent are invalid because they fail to meet the requirements for patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.  Plaintiffs seek a declaratory judgment to such effect.

## SECOND CLAIM FOR RELIEF

### (Declaration of Non-Infringement of U.S. Patent No. 7,601,858)

124.    Plaintiffs repeat and reallege paragraphs 1 through 123 above with the same force and effect as if fully set forth herein.

4397760v.2

125.     There is an actual and justiciable controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, between Plaintiffs and Defendants concerning the non-infringement of the '858 Patent.

126.     Plaintiffs' activities for corn oil recovery do not infringe, directly or indirectly, any valid claim of the '858 Patent. Plaintiffs seek a declaratory judgment to such effect.

## THIRD CLAIM FOR RELIEF

### (Lanham Act)

127.     Plaintiffs repeat and reallege paragraphs 1 through 126 above with the same force and effect as if fully set forth herein.

128.     In connection with its services, which are offered in interstate commerce, GreenShift has made false or misleading descriptions or representations of fact. These false or misleading statements misrepresent the nature, characteristics, or qualities of GreenShift's services or commercial activities. GreenShift's statements are expressly false, impliedly false, or both.

129.     GreenShift's false or misleading statements have deceived, or have the tendency to deceive, a substantial portion of the intended audience, about matters that are material to their purchasing decisions.

130.     GreenShift's misrepresentations are part of a concerted campaign to penetrate the national market for corn oil recovery. As such, the misrepresentations are made in commercial advertising and promotion within the meaning of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

4397760v.2

131.   GreenShift's campaign was undertaken in both objective and subjective bad faith, as demonstrated by GreenShift's hyperbolic, false and misleading, and baseless threats to Westfalia customers in mid-2005, July 2009, and October 2009, and in related press releases; by the length and vigor of the campaign of intimidation; and by GreenShift's persistence in its tactics despite multiple warnings by both Westfalia and ICM about the baselessness of GreenShift's claims.

132.   GreenShift's actions since the commencement of this litigation underscore its bad faith. For example, in connection with the briefing on GreenShift's motion to dismiss Westfalia's Lanham Act claim, GreenShift's counsel egregiously misquoted the applicable law on provisional patent rights by truncating the judicial opinion of a federal district court – just as GreenShift had previously done when it selectively quoted portions of § 154(d) of the patent statute to Westfalia's customers. In short, the totality of GreenShift's actions confirm that it recognized that it had no provisional rights under the patent statute but that the company nevertheless elected to repeatedly misrepresent the applicable law, in bad faith, in order to trick Westfalia's customers into paying GreenShift a royalty.

133.   Plaintiffs are likely to suffer, have suffered, and will continue to suffer damage as a result of GreenShift's wrongful acts.

134.   By reason of the foregoing, GreenShift has violated Section 43(a) of the Lanham Act.

WHEREFORE, Plaintiffs respectfully request that the court:

A.     Declare that the claims of U.S. Patent No. 7,601,858 are invalid;

B.     Declare that Plaintiffs' activities for corn oil recovery do not infringe, directly or indirectly, any valid claim of U.S. Patent No. 7,601,858;

34

C.      Issue an order that preliminarily and permanently enjoins GreenShift, its agents, attorneys, servants, employees, representatives, and all others in active concert or participation with them, from:

1.      Directly or indirectly using in commerce or causing to be disseminated any advertisements or promotional materials containing any of the false or misleading claims described in this complaint; and

2.      Directly or indirectly using in commerce any claim, statement, or representation that states or implies that Ace Ethanol or any of Westfalia's other customers is or may be liable to GreenShift for practicing the processes allegedly covered by GS CleanTech's patent applications prior to the issuance of those patents;

D.      Issue an order directing GreenShift to issue appropriate corrective advertisements and promotional materials, reasonably designed to reach all people to whom its false and misleading advertisements and promotional materials were disseminated, retracting the false and misleading claims;

E.      Award the maximum dollar amount permitted by the Lanham Act, including damages and/or profits (trebled as provided by law);

F.      Award Plaintiffs' their attorneys' fees, costs and disbursements; and

G.      Grant such other and further relief as the Court deems just and appropriate.

4397760v.2

## Jury Demand

Plaintiffs respectfully demand a jury trial on all issues triable to a jury in this action.

Dated: November 15, 2010

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____
      Gregory L. Diskant
      Michael F. Buchanan
      Brian N. Lasky
      Edward R. Tempesta
      Sean Marshall
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
gldiskant@pbwt.com
mfbuchanan@pbwt.com
bnlasky@pbwt.com
ertempesta@pbwt.com
smarshall@pbwt.com

Attorneys for Plaintiffs GEA Westfalia Separator, Inc. and Ace Ethanol, LLC

36

4397760v.2